## CARPENTER *v.* DAME and Others.

Each deposition in a cause is an independent paper, and the suppression of one is not necessarily dependent upon the suppression of another.

The party taking a deposition cannot himself object to it on the ground of want of notice to the other party.

But where, of several depositions taken by a defendant at the same time and place, and upon the same notice, all but one were suppressed on the motion of the plaintiff—*held*, that the suppression furnished ground for a motion to continue.

Whether, in such case, the defendant should be permitted to withdraw his remaining deposition, lies in the discretion of the Court, or may be determined by its rules.

And *it seems* that the plaintiff may, in the discretion of the Court, read the deposition in evidence before the defendant has offered any evidence, if no objection be made except as to the time of reading it.

Suit to compel the specific performance of a bond for the conveyance of land, brought by the heirs of the obligee. The bond had been destroyed, and a new one executed in its place to the widow and heirs. The widow had released her interest. It was alleged that the obligor had fraudulently procured the destruction of the original bond, and substituted the new one, different in its terms. *Held*, that the widow was admissible as a witness to prove the contents, execution, delivery and destruction of the lost bond.

Under the statute of 1852, a freeholder is not a competent juror unless he be also a householder.

*Quære:* Does the word *householder* as used in that statute mean a holder in fee or a leaseholder of a house? or does it mean a housekeeper, or the head of a family occupying a house?

The question of mental capacity goes to the competency of a witness, and is

May Term,
1858.

CARPENTER
v.
DAME.

for the Court; but, *quære*, whether, if the Court should hold the witness competent, and he should testify, the opposite party might be permitted to prove actual incompetency, or a weakness in a given faculty, or in all the faculties, to affect his credibility, though such proof might not be sufficient to exclude the witness.

The officer taking a deposition cannot decide legal questions. The objection to the mental capacity of a deponent must be made in the Court to which the deposition is forwarded; and if the Court should hold the witness competent, and the deposition admissible, *quære*, whether the question may be opened again before the jury.

In this case, the appellees had taken the deposition of the witness, and it was read in evidence at a previous, indecisive trial. It was again used in the trial resulting in the judgment appealed from. No objection was raised to it. Between the two trials, the appellant took his deposition, and still claimed it to be a part of his evidence. The witnesses lived in *Ohio*, where evidence to sustain his mental capacity, if impeached, would have to be sought, and it could not be produced upon the trial in progress. *Held*, that the Court wisely exercised its discretion in refusing to permit the mental capacity of the witness to be impeached.

As a general rule, there are no degrees of secondary evidence. *Coman et al.* v. *The State*, 4 Blackf. 241, overruled as to this point.

Tuesday,
May 25.

APPEAL from the *Tippecanoe* Circuit Court.

PERKINS, J.—Suit to compel the specific performance of a bond for the conveyance of real estate. The bond is alleged to have been given by *John Carpenter* to *Benjamin O. Carpenter*. The suit is by the heirs of *Benjamin*, deceased, against *John*. The bond upon which it is instituted had been destroyed, and a new one executed in place of it, to the widow and heirs of *Benjamin O. Carpenter*. It is alleged that *John Carpenter*, the obligee, fraudulently procured the destruction of the original bond, and substituted for it one differing in its terms. The widow of *Benjamin* released all her interest in the lands named in the bond to her children, the heirs.

Answer and replication filed. Trial by jury, who returned a verdict as follows:

" We, the jury, find for the plaintiffs, and assess their damages at 500 dollars; and we further find that the plaintiffs, who are heirs at law of *Benjamin O. Carpenter*, deceased, are entitled to a conveyance of the undivided one-third of the lands described in the complaint as lying in *Tippecanoe* county, *Indiana.*"

The appellant filed a motion for a new trial, assigning

the usual causes, which the Court overruled, and rendered judgment in accordance with the verdict.

As there is some evidence tending to support the verdict, this Court must accept it as conclusive of the merits, if the Court below committed no error in its rulings during the course of its proceedings resulting in that verdict. *Gatling* v. *Newell*, 9 Ind. R. 572.

Among the depositions filed in the cause by the appellant, was that of *Matthew Gilfillan*. It was one of a number of depositions, taken by him at the same time and place, and upon the same notice.

The appellees moved to suppress all of the depositions thus taken, except that of *Gilfillan*, for want of sufficient notice, and the Court sustained the motion. The appellant then moved to suppress that of *Gilfillan* for the same reason, and the Court overruled the motion.

Each deposition was an independent paper in the cause. One might be legal, another not; and the suppression of one would not necessarily be dependent upon the suppression of another. And as the deposition of *Gilfillan* was taken by the appellant, the want of notice to the other party could be no ground of objection on the part of him who took the deposition. The suppression of his other depositions, on the motion of the appellees, might have furnished him ground for a motion to continue.

After the motion to suppress was overruled, the appellant asked leave to withdraw the deposition, but leave was refused. This was a matter in the discretion of the Court —a rule of Court might regulate the practice on this point. It may have done so in this case, for aught that appears of record.

The Court then permitted the appellees to give the deposition in evidence. The giving in evidence does not seem to be objected to, but the time at which it was permitted to be done. Counsel say:

" The second error complained of is: The Court permitted the appellees to read the deposition of *Gilfillan*, taken by the appellant, in evidence before the appellant had given any evidence in his defense.

"Even if the Court ruled correctly in refusing to quash this deposition, that ruling did not make the deposition part of the appellees' evidence, and the Court should have given to the appellant the privilege of marshaling his evidence in his own way, provided in so doing he violated no rule of practice."

There is not enough appearing of record to enable us to say that the Court abused its discretion on the question of time of reading the depositions.

The record states that the plaintiffs (the appellees), on the trial of the cause, "produced *Matilda Carpenter* as a witness in their behalf, who testified that she was the widow of *Benjamin O. Carpenter*, deceased, and the mother of the plaintiffs; and thereupon the plaintiffs offered to prove by her the contents of the lost bond on which the suit was founded, and which bond plaintiffs alleged was given by the defendant, to said *Benjamin O. Carpenter*, during the coverture of said *Matilda;* and also to prove the execution and delivery of said bond, and its destruction; to the making of which proof by said witness the defendant objected, but the Court overruled the objection, and permitted her to testify," &c. As Mrs. *Matilda Carpenter* had released all her interest in the land sued for, she was not a necessary party to the suit. *Shaw et al.* v. *Hoadley*, 8 Blackf. 165. Her deceased husband was not, either actually, or within the spirit and meaning of the statute, a party. *Riser et al.* v. *Snoddy*, 7 Ind. R. 442. She could not be excluded, then, as a witness, on account of being a party; for she was not such, and the judgment rendered would in no manner accrue to her benefit. She could not be excluded from interest; for even if it existed, it did not disqualify. *Jack* v. *Russey*, 8 Ind. R. 180. She was not called to testify for or against her husband; for he was not a party to the suit. Her exclusion, therefore, could not be placed upon this ground. Could it be put upon the ground that she was offered for the purpose of disclosing communications between her and her husband, made during coverture? Without here attempting to define with precision what are to be considered, in all cases, such communica-

tions, we will say that we do not think the definition should be broad enough, when given, to embrace the testimony of Mrs. *Carpenter* in this case. This is very like the case of *Jack* v. *Russey, supra,* by which we think the ruling below, now under consideration, is justified.

The Court sustained a challenge to a juror. The record states that " *Charles Stockton,* a talesman, was called as a juror; that during his preliminary examination under oath, as to competency, he was asked whether he was a householder, to which question he answered that he was a married man, and owned a farm in the county; that he rented his farm and house on it, but by an arrangement since the lease, with his tenant, he holds a part of his house, and claims possession of it, has his household goods in it, considers it his home, keeps a post-office in the house which he tends to himself, or by deputy; that he is not there more than one-eighth of his time, and since the renting of his house, his wife has been visiting among friends in the county. Upon these facts the Court sustained a challenge to said *Stockton,* as a competent juror, for cause. The ruling was excepted to.

The correctness of the ruling depends upon the scope to be assigned to the word, *householder.* Did the legislature intend, by using that term, to render incompetent a freeholder who was not also a householder? Or did they use it merely to express a less degree of property, meaning thereby to diminish the qualification required. Did they mean to concede that a freeholder would be competent, of course, and, by the use of the word householder, to extend the qualification to those possessed of a leasehold interest?

We think this is not the interpretation. The language will not justify it. A man may be a large owner of lots and lands—a freeholder, but there may be no house upon the freehold. And had the legislature intended to have rendered competent both freeholders and householders, it is reasonable to suppose they would have said so. They did say so in the code of 1843. See p. 951, § 2. But in the code of 1852, the word *freeholder* is dropped, and the qual-

May Term, 1858.

CARPENTER
v.
DAME.

ification of householder required in all cases.  2 R. S. p. 24, § 1.

The next inquiry is, in what sense, as to qualifications, is the word *householder* used in the statute?  Does it mean simply that he must be a holder in fee, or a leaseholder of a house, or does it mean that he must be a housekeeper—the head of a family occupying a house?  The word, in statutes, seems generally to be used in this latter sense. See a collection of *English* cases on the word *housekeeper*, in 3 Petersdorff, pp. 103 to 106.  It is so used in our statute exempting property from execution.  *Wharton*, in his Law Dictionary, defines a householder, to be the master of a family.  It would seem that the legislature held that a man was not qualified to discharge the duties of a juror till he had had the experiences, and felt the sympathies and responsibilties of the head of a family; nor unless he continued to live with his family.  If such be the construction of the statute, it is certainly very doubtful whether *Stockton*, in this case, had the qualifications of a juror; but we need not decide the point here, for the record does not show that any intended unfairness was practiced in the selection of the jury, nor but that a perfectly impartial and satisfactory one was obtained to try the cause.  *The People* v. *Ransom*, 7 Wend. 417.—*The King* v. *Hunt*, 4 B. and A. 430.

The appellant offered to prove to the jury, that *Matthew Gilfillan* was not of sound memory; but the Court refused permission.  In this, it is claimed by the appellant that the Court erred; while the appellees contend that it was not a question to be tried by the jury, but by the Court, before the evidence of the witness was submitted to the jury.

Matter that goes to the competency of a witness, is for the Court, that which goes to his credibility, for the jury. Most matters which formerly went to the competency, now, by statute, in this state, go to the credibility of witnesses. It may be proved that a witness is interested, has been convicted of a crime, is not of good moral character, does not believe in the existence of a Supreme *God*, or in the chris-

tian religion. And, finally, section 243, 2 R. S. p. 83, enacts
that "any fact which might heretofore be shown to render
a witness incompetent, may be hereafter shown to affect
his credibility."

The want of mental capacity, however, by the statute,
goes to the competency of a witness (2 R. S. p. 81); and
where he was introduced in Court to be sworn to testify,
the Court, on the objection being raised, would satisfy it-
self, by an examination of the proposed witness, or by hear-
ing evidence, of the validity of the objection, before it per-
mitted the witness to testify. Whether, if the Court should
hold the witness competent, and he should testify, the op-
posite party might be permitted to prove actual incompe-
tency, or a weakness in a given faculty, or in all the facul-
ties, to affect the credibility of, though it did not exist in a
sufficient degree to exclude, the witness, we do not decide,
though such would seem to be inferable from the above
quoted statute. In cases of written instruments offered in
evidence, but objected to as invalid in their execution, &c.,
the Court first decides upon the objection, but it is again
open to the jury. See note to 1 Greenl. Ev. p. 714.

But in this case the witness was not introduced in Court
—the Court had no opportunity to test the capacity of the
witness; and the officer who took his deposition had no
right to decide upon legal questions, if raised at the taking.
He was not a Court. It was his duty to take down all the
testimony of the witnesses produced, and forward it to the
Court in which it was designed to be used. In that Court,
all objections would be raised, heard, and decided. The
objection in this case, might, at the proper time, and by the
proper party, have been made to the Court, in the first in-
stance; and if the Court had held the deponent competent,
and his deposition admissible, we do not say the question
might not have been opened again before the jury. We
do not feel called upon to decide the point here, for we
think, in this case, there are other considerations which will
sustain the ruling of the Court below.

It appears that the appellees had taken *Gilfillan's* depo-
sition which had been read in evidence at a previous, inde-

cisive trial; that it remained on file to be, and was, again used on the trial resulting in the judgment appealed from, and that no objection had been raised to it. Between the two trials the appellant took *Gilfillan's* deposition, and still claimed it to be a part of his evidence. The witness lived in *Ohio*, where evidence would have to be sought to sustain his mental capacity, if impeached, and could not, of course, be produced at the trial then in progress. Under these circumstances, we think the Court wisely exercised its discretion in refusing to permit the attempted impeachment.

The Court refused to give the following instruction:

" That a written copy of a bond made fifteen years ago, sworn to by the person who wrote and witnessed it, is better evidence of the contents of the original, than verbal evidence given from memory only, if the witnesses are equally credible."

Whether the Court refused this instruction because it did not consider it strictly applicable to the evidence; or did not consider it to be law; or considered that, if law, the appellant, having himself destroyed the original bond, had not a right to the benefit of the rule,—we are not advised. But it seems that the better opinion now is, that there are no degrees, as a general rule, in secondary evidence. 1 Greenl. Ev. p. 738. See 1 Greenl. Ev. p. 159, note; 3 Wend. Black. Com. p. 368, note 28; *Doe* v. *Ross*, 7 M. & W. 102, and note on p. 108. The case of *Coman et al.* v. *The State*, 4 Blackf. 241, cannot be applied as law to the case now before the Court. A difference may be created by statute.

The Court did not instruct the jury that interest must be considered in weighing the testimony of a witness, but doubtless would, if such an instruction had been asked. See *Spivey* v. *The State*, 8 Ind. R. 405.

We are unable to discover any error in the ruling of the Court below, sufficient to justify a reversal of the judgment.

*Per Curiam.*—The judgment is affirmed, with 1 per cent. damages and costs.

*J. M. La Rue, W. C. Wilson* and *J. Pettit,* for the appellant (1).

*Z. Baird, R. C. Gregory* and *R. Jones,* for the appellees (2).

(1) Counsel for the appellants cited authorities to the following points:

1. We do not think it competent for a party to select out of a batch of depositions taken at the same time, and certified together, that one which he conceives makes in his favor, and quash the others for want of notice, especially when the party has done no act indorsing the deposition, or recognizing the taking by the opposite party. We also contend that the deposition was under the control of the defendant, and he had the right to withdraw it from the files. *Polleys* v. *Ocean Ins. Co.,* 2 Shep. 141. The Court, in that case, decided that a party may withdraw his deposition at any time, but that by rules 21 and 43 of the Supreme Court of *Maine,* this privilege is restricted to the first term after the deposition is filed. The general principle then, in absence of the rule, would be that a party controls his own depositions.

2. Mrs. *Carpenter* could not have been a witness had her husband been living; and she cannot testify after his death in favor of those who occupy the position which he might have occupied had he been living. In *Cook* v. *Grange,* 18 Ohio R. 526, this question is canvassed and settled upon proper principles. The Court say, p. 531, "Shall it [the incompetency] be confined to such communications as have been made in confidence? or shall it embrace all transactions which occurred during the marriage in which either party may be affected, either pecuniarily or in reputation: in other words, all transactions which, at the time they happened, the witness would have been incompetent to prove? The latter, we think, is the true rule, and therefore adopted. See, also, Stark. Ev. pt. 4, tit. Husband and Wife, Competency.

3. A party may show the imbecility of a witness whose deposition is read by the opposite party. 1 Stark. Ev. pt. 3, § 57, tit. Ability of Witnesses.

4. In *Coman* v. *The State,* 4 Blackf. 241, it is decided that "the rule of law—that the best evidence which the nature of the case will admit of must be adduced—applies as well to secondary as to primary evidence. When an original writing is lost, or is in the possession of the adverse party, its contents may be proved, first, by a counterpart, if one exist; secondly, by a copy, if there be no counterpart; and thirdly, by parol testimony, if there be neither counterpart nor copy." See, also, 1 Stark. Ev. pt. 2, § 149.

(2) Counsel for the appellees cited authorities to the following points:

1. The law furnishes a valuable guide in the determination of this case, in that strong presumption in which it indulges against the spoliator of a written contract, or record evidence of any character. *Omnia præsumuntur contra spoliatorum.* "The spoliation of papers is an aggravated and inflamed circumstance of suspicion. The fact may exclude further proof, and be sufficient to infer guilt; but it does not, in *England,* as it does by the maritime law of other countries, create an absolute presumption *juris et de jure;* and yet, a case that escapes with such a brand upon it, is saved so as by fire. * * * If explanation be not prompt, or be weak or futile; if the cause labors under heavy suspicions, or there be a vehement presumption of bad faith, it is good cause for the denial of further proof; and the condemnation ensues from defects in

the evidence which the party is not permitted to supply.". 1 Kent's Com. 157. —1 Greenl. Ev. § 37.—3 Cowen & Hill's Notes to Phillip's Ev. note 285, p. 456. This principle is not peculiar to maritime law—it is as fully recognized by Courts of common law, as those of admirality jurisdiction. The cases illustrative of the application of this principle are collected by Mr. *Broom* in his Essay on Legal Maxims, at page 725—title, the maxim above cited. Around the above-cited, cluster other maxims of a kindred nature. *Nemo ex suo delicto meliorem conditionem suum facere potest. Nullus commodum capere potest de injuria sua propria.* If the appellant succeeds in his defense, there is great danger that he will have gained an advantage by his own wrong. See; also, *The Life and Fire Ins. Co.* v. *The Mech. Fire Ins. Co.,* 7 Wend. 31, and Wills on Presumptive Evidence, p. 72.

2. We submit that the verdict is clearly sustained by the evidence, and ought not to be disturbed, though the Court may have committed errors in the progress of the trial (*Bischof* v. *Coffelt,* 6 Ind. R. 23); especially as there have already been two trials of the cause. *Cunningham* v. *Magoun,* 18 Pick. 13.—*Baker* v. *Briggs,* 8 Pick. 122.

3. In all cases where the husband is a party, and his pecuniary interest is directly involved, the rule excluding the testimony of the wife is absolute. No other relation excludes. The rule is founded partly on their identity of interest, and partly on public policy, "which deems it necessary to guard the security and confidence of private life, even at the risk of an occasional failure of justice." 1 Phil. Ev., Cowen & Hill's last ed. p. 69. This rule does not extend to collateral proceedings not immediately affecting their mutual interests, notwithstanding that the evidence of the one may tend to criminate or to contradict the other, or to subject the other to a legal demand. "A wife may be a witness in an action between third persons, not immediately affecting the interest of the husband, though her evidence may possibly expose him to a legal demand; as in an action between third persons for goods sold and delivered, to prove that the goods had been sold, not on the credit of the defendant, but on her husband's credit." 1 Phil. Ev. 71, 73, 74 same ed.—1 Greenl. Ev. § 342. The wife after the death of her husband is competent to prove facts which did not come to her knowledge by means of her relation as a wife, notwithstanding that they relate to the transactions of her husband. 1 Greenl. Ev. § 338. The author cites, to support the text, *Coffin* v. *Jones,* 13 Pick. 441.—*Williams* v. *Baldwin,* 7 Verm. R. 506.—*Wells* v. *Tucker,* 3 Binn. 366.—*McGuire* v. *Maloney,* 1 B. Mon. 224. In the case of *McGuire* v. *Maloney,* the latter sued the former as administrator of the estate of *John Maloney, Sr.,* in trover, to recover the value of goods and chattels which *McGuire,* as such administrator, had sold. The widow of the deceased was held to be a competent witness in the case, to prove property in the goods in litigation in the plaintiff, under a sale from her deceased husband. In *Fitch* v. *Hill* and another, 11 Mass. R. 286, it is said by the Court that, "Where the husband is a party, the wife cannot be sworn either for or against him:—not for him, because their interest is one, and she may be expected to favor him; not against him, because it would be likely to create dissensions. But where the liability of the husband is contingent, and not necessarily established by the trial, in which she is called as a witness, her testimony may be received." *Beveridge* v. *Minter,* 1 C. & Paine 364, was an action brought by the plaintiff against the defendant to recover £150, which the defendant's testator had promised to pay the plaintiff. The widow of the tes-

tator was called by the plaintiff to prove his demand, and the Court ruled that she was a competent witness.

4. To exclude the testimony of the wife solely on account of one of the causes above stated, it is essential that the facts which she is called to prove, should have come to her knowledge solely by virtue of that confidence which the marriage relation implies. "This rule, in its spirit and extent, is analagous to that which excludes confidential communications made by a client to his attorney." 1 Greenl. Ev. § 338. Tested by that analogy, it is clear that the knowledge which Mrs. *Carpenter* possessed of the facts to which she testified, was not derived in a mode which could prevent its communication in a court of justice. 1 Greenl. Ev. § 244. In the case of *McGuire* v. *Maloney*, above cited from B. Monroe, it is said by the Court that, "The law will not permit, even after the death of the husband, any disclosure by the wife, which seems to violate the confidence reposed in her as a wife, lest such permission might tend to impair the harmony of the marriage state, and affect injuriously the interests of society dependant upon it. But where there is not even a seeming confidence, when the act done or declaration made by the husband, so far from being private or confidential, is designedly public at the time, and from its nature must have been intended to be afterwards public, there is no interest of the marriage relation or of society, which, in the absence of all interest of the husband or the wife, requires the latter to be precluded from testifying between other parties to such act or declaration, not affecting the character or person of the husband." *Ratcliff* v. *Wales*, 1 Hill, 63, was an action for criminal conversation by the defendant with the plaintiff's wife. The plaintiff after showing a divorce *a vinculo matrimonii*, called his former wife to prove the adultery. The Court ruled her a competent witness on the ground that she came to the knowledge of the fact that she was called to testify to, not by virtue of that confidence which the marriage relation, in legal contemplation, inspires, but by acting in gross violation of it.

5. Mrs. *Carpenter*, before the commencement of this suit, assigned all her interest under the spoliated bond to the appellees, who are heirs at law of her deceased husband. This assignment is dated the day this suit was commenced, and is made a part of the complaint. It was entirely legitimate for her to execute that assignment, and thereby restore her competency, if she were otherwise incompetent. "The competency of a witness disqualified by interest, may always be restored by a proper release. If it consists in an interest vested in himself, he may divest himself of it by a release or other proper conveyance." 1 Greenl. Ev. § 426. "It is not necessary that the release be actually delivered by the releasor. It may be deposited in Court for the use of the absent party." *Id.* 429.

6. "Mere extracts can not be used as examined copies, though the witness by whom they are proposed to be proved, is ready to swear that there was nothing in the original, relating to the matter in controversy, beyond what is contained in the extract; for to give a proper construction to the instrument the whole must be looked into; and the testimony of a person swearing that all which relates to the controversy is contained in what is produced, necessarily and at best amounts only to matter of opinion, which it is dangerous to rely upon in such cases." Cowen & Hill's Notes to Phil. Ev. note 250, p. 239. The authors cite *Dennison* v. *Barber*, 6 Serg. & Rawle, 420. "If a party offer a copy of a deed, or will, where he ought to produce the original, this raises a pre-

May Term, 1858.

CARPENTER
v.
DAME.

sumption that there is something in the original deed or will which would make against him, and therefore the copy in such case is not evidence. But if he prove the original deed or will to be in the hands of the adverse party, who refuses to produce it after receiving a regular notice for that purpose—or, if he prove that the original has been lost or destroyed, without his default, no such presumption can reasonably be made, and a copy will be admitted." 1 Phil. Ev. 418, ed. above cited. The rule admitting in evidence a copy, where the original has been destroyed, has received a very important qualification, from the pen of that authoritative writer on the doctrines of evidence. In Cowen & Hill's edition of Phillips on Evidence, the editors say, "A party who, under no pretence of mistake or accident, voluntarily destroys primary evidence, for any fraudulent purpose, thereby excludes himself from the benefit of superior evidence." Note 221, p. 215 of vol. 2. The authors cite *Riggs* v. *Tayloe*, 9 Wheat. 483. These authorities establish that a party who has voluntarily and deliberately destroyed the original, cannot use its copy as evidence of a superior character to parol testimony.

7. Our statute clearly contemplates that when a deposition has been taken and filed, the same becomes a record, under the control of the Court, in which either party to the cause, independent of the consideration under whose notice it was taken, has an equal property. This seems to be the rule in other states. *State Bank* v. *Western Bank*, 2 Miles (Pa.) 16.—*Walton* v. *Bostick*, 1 Brevard (S. Car.) 162. We cite these cases from *U. S. Digest*, vol. 4, 666, 667. The reported cases are not within our reach.

8. To constitute a householder, actual possession of the house is necessary (1 Chit. Rep. 222); and of the whole of it. *Id.* 316.

9. An irregularity in impanneling a jury will not vitiate the verdict, unless it appear that the party complaining was injured thereby. *The People* v. *Ransom*, 7 Wend. 417.—*The King* v. *Hunt*, 4 Barn. & Ald. 430.

10. Idiots and persons of insane mind are incompetent witnesses. Whether a witness produced upon the stand, or his deposition offered in evidence, is incompetent from want or deprivation of reason, is a question, exclusively, for the determination of the Court, and the evidence in relation to it is therefore addressed to that tribunal. 1 Phil. Ev. 1 to 4. After the witness has been ruled admissible, and his evidence given to the jury, his credibility may be assailed by proof that his general moral character is bad, by contradicting his statements by other witnesses, and by cross-examination, in which the widest latitude is given to the party adverse to whom he has testified, to test his capacity to testify intelligently, and the motives by which he is governed. In *Englând* the inquiry as to character is limited to that for veracity. The *American* rule, proceeding upon the ground that all vices are of a kindred nature, permits proof to be given of the general moral character of the witness assailed. We have failed, after diligent search, to find an elementary author, or an adjudicated case, stating the rule so broad as to permit a witness to be assailed by proof derogatory of his mind or memory. An inquiry of that character would introduce an obstacle in jury trials equally novel and embarrassing. It is competent to prove that when the events which a witness has testified to, occurred, he was in a condition that unfitted him to have accurate knowledge of them— as, for instance, that he was drunk, or had an epileptic fit. Cowen & Hill's Notes to Phil. Ev., note 387, p. 432. If such proof were admissible it could only be made by experts—persons learned in the philosophy of mind, and then

only, after the facts upon which their opinions were based, had been fully given in evidence. *Dickinson* v. *Barber*, 9 Mass. R. 225. This is the rule in the trial of the issue *devisavit vel non*, where the mind and memory of the testator are involved. Certainly it requires as much skill to define the degree of memory or intellect which a witness may possess, as to ascertain his entire deprivation of it.